Pesante Martínez, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
El apelante, Jorge Marcano Parrilla, fue acusado por cargos de asesinato en primer grado, e infracciones a los artículos 6 y 8 de la Ley de Armas de Puerto Rico por hechos ocurridos el 21 de septiembre de 1992.
Luego de los trámites usuales en este tipo de caso, el jurado lo encontró culpable de todos los delitos imputados. El Honorable Raúl Torres Dávila, Juez del Tribunal de Primera Instancia, Sala Superior de Caguas, dictó sentencia en su contra condenándolo a cumplir 93 años de prisión por el *703 cargo de asesinato en primer grado, 5 años por la infracción al artículo 8 y 3 años por la infracción al artículo 6 de la Ley de Armas. Las penas por las infracciones a la Ley de Armas se impusieron de forma concurrente entre sí pero consecutiva con la pena por asesinato en primer grado.
El 28 de junio de 1995, el apelante presentó un recurso de apelación. En él procura la revocación de las sentencias aludidas y señaló errores en la apreciación de la prueba, las instrucciones impartidas al jurado, en no tomar medidas correctivas y/o preventivas para impedir la publicidad periodística y al limitar el contrainterrogatorio al principal testigo de cargo.
Por las razones que más adelante habremos de exponer, confirmamos las sentencias en controversia.
I
La prueba presentada por el Ministerio Público, recogida en una voluminosa transcripción, consistió en los testimonios de:
Agente Juan Rodríguez Tosado de la División de Homicidios del CIC de Caguas. Este fue el primer agente en llegar a la escena de los hechos en la madrugada del 21 de septiembre de 1992. Para esa fecha el agente Rodríguez Tosado se desempeñaba como investigador nocturno. Se le encomendó que realizara la investigación preliminar de un incidente acaecido en el Residencial Jardines del Condado en Caguas en donde murió, a causa de múltiples heridas de bala, Víctor Manuel Pérez Ortiz.
El occiso fue encontrado tirado en la acera junto a una verja de acero eslabonado detrás de un Volkswagen. En los alrededores, el agente ocupó varios casquillos de bala de diversos calibres; a saber, 45, 9 mm. y 223. Así también, ocupó dos vehículos: un Volkswagen azul turquesa y un Honda, CRX rojo. En el interior del Volkswagen ocupó dos pistolas cargadas, que aparentaban no haber sido disparadas, calibres nueve milímetros y 380. El vehículo mostraba en el cristal delantero un impacto de bala que aparentaba haber sido hecho desde afuera.
El agente Rodríguez Tosado declaró haber tomado en una libreta apuntes relacionados con su intervención. También se tomaron fotos de la escena y de la evidencia recopilada. Concluida su encomienda redactó un informe a manuscrito que posteriormente fue pasado a maquinilla por una secretaria. En el informe, el agente describió las armas ocupadas como negras. Sin embargo, en el recibo de entrega de las armas al agente que se haría cargo de la investigación, se hace constar que una de ellas es niquelada con cachas negras y la otra, negra. Dicho recibo, cumplimentado el mismo día, consigna además del color de las armas, su calibre, la marca y el número de serie. 
El agente Rodríguez Tosado atestó que la cámara fotográfica que se utilizó para documentar la escena y la evidencia, estaba dañada por lo que las fotos corrieron igual suerte. Además, se le había extraviado la libreta en la que había hecho los apuntes. Justificó lo anterior, en que habían transcurrido aproximadamente tres años entre los hechos y su declaración en corte.
Declaró que no levantó huellas en las armas ni en los vehículos ocupados porque había llovido y la evidencia estaba muy mojada. Entre la evidencia ocupada esa noche se encontraba un beeper con mensajes. Este pertenecía al occiso y al intentar recuperar los mensajes, éstos se borraron.
Finalmente declaró, que el mismo día, pero en horas de la mañana, le hizo entrega, mediante recibo, de toda la evidencia recuperada en la escena de los hechos al agente Alberto Vélez Torres.
El Agente Alberto Vélez Torres manifestó ser investigador de la División de Homicidios del CIC. El 21 de septiembre de 1992 fue asignado para investigar los hechos que motivaron la convicción del apelante. El testigo recibió de manos del agente Rodríguez Tosado la evidencia ocupada en la escena: dos vehículos de motor; dos armas de fuego, varios peines cargados con proyectiles y varias pertenencias del occiso, entre ellas un beeper que posteriormente le fue entregado a la novia del occiso. Atestó que llevó al Instituto de Ciencias Forenses las armas, peine, casquillos, proyectiles y blindajes recuperados y sq quedó con uno de los peines del arma 9mm ocupada, el cual marcó con sus iniciales. Describió las armas ocupadas por Rodríguez Tosado y recibidas por él como una 9mm niquelada y la otra 380 color negra. Preparó un Informe haciendo una relación de la evidencia *704 ocupada, y entre otra descripción, consignó que las armas eran negras. Admitió que ello era un error, que una era niquelada y la otra negra. Este adujo que en el recibo se hizo constar la descripción completa, detallada y correcta de las armas. Que lo medular era el número de serie, que no había dos armas con el mismo número de serie y que no tenía dudas que las armas que le entregó Rodríguez Tosado eran las mismas armas que estaba identificando en corte abierta.
El agente Vélez Torres declaró que no se levantaron huellas porque la evidencia estaba mojada a consecuencia de que la noche o madrugada de los hechos había llovido, copiosamente. El Volkswagen estaba abierto y su interior mojado. Las armas estaban húmedas. Consultó con Javier Burgos, técnico en huellas, y éste le informó que en esas condiciones era imposible levantar huellas.
En el transcurso de su investigación y bien cercano a la fecha de los hechos, recibió una llamada del Jefe de Saturación del Area de Aguadilla y éste le comunicó que había una persona herida en Aguadilla que aparentemente había sido herida en un incidente en Caguas.
El 25 de septiembre, cuatro días después de los hechos, el agente Vélez Torres, en compañía de otro agente, fue a Aguadilla y se entrevistó con el testigo principal del fiscal Joaquín Lassalle. La entrevista se llevó a cabo en la casa que el testigo compartía con sus padres. Se percató que estaba herido en la espalda y en el muslo. Lassalle le dió su versión de los hechos. Le indicó que era el dueño del Volkswagen. Le mostró la licencia del registro de Obras Públicas y la llave. El vehículo en cuestión lo había comprado a un tal Albert pero no habían hecho el traspaso. El agente verificó a través del sistema de computadoras de Obras Públicas y el vehículo no aparecía reportado como hurtado.
De la entrevista surgió que varias personas fueron a buscar a Lassalle a su casa y que seis personas se dirigieron en tres carros a San Juan. Lassalle le admitió que estaba armado con una pistola 9mm, y que el propósito de la visita de estas personas fue que interviniera en un asunto en que había resultado herido un hermano de uno de los que lo habían ido a buscar.
Tres días después de la entrevista, el 28 de septiembre, Lassalle acompañó al agente Vélez Torres al sitio donde ocurrieron los hechos. También le mostró el matorral donde éste le aseguró que se había escondido durante toda la madrugada del 21 de septiembre. Allí el agente observó que el matorral estaba aplastado y presentaba unas manchas oscuras, las cuales supuso eran sangre, aunque no pudo asegurarlo. Tomó fotos del matorral, con la misma cámara utilizada por el agente Rodríguez Tosado, pero las mismas se dañaron. El agente declaró que no solamente se dañaron las fotos del presente caso sino también las de tres o cuatro casos posteriores. Esta información se la proveyó Rubén de Jesús, supervisor de la Unidad de Servicios Técnicos del CIC de Caguas.
Ese mismo día, el agente realizó una rueda de confrontación fotográfica y Lassalle identificó al apelante como la persona que había matado a Víctor M. Pérez Ortiz. Declaró que no se pudo celebrar una rueda de confrontación (line-up) porque no había sido posible localizar al apelante. Alegó haberlo buscado en la casa de su mamá y donde creía que trabajaba y que éste, cuando lo localizaba, se les escapaba. Inclusive lo habían localizado en un área identificada con el trasiego de drogas, pero el apelante logró burlarlos. 
De la entrevista que le hiciera el agente Vélez Torres a Lassalle surgió que éste, luego de haber pasado la noche escondido en el matorral, salió en dirección a la autopista y un guardia lo llevó al hospital a recibir atención médica. Lassalle le indicó al guardia que las heridas se las había producido al entrar a una jaula de caballos. El agente Vélez Torres no procuró localizar a este policía, tampoco a los dueños regístrales de los carros ocupados, así como tampoco a las personas que le fueron a buscar a Aguadilla, ni a la amiga que lo recogió en el Centro Médico y lo llevó de vuelta a Aguadilla. Declaró que estuvo presente cuando tres meses después le tomaron la declaración jurada a Lassalle. Alegó desconocer porqué se tardaron tanto en tomarle la declaración. Meses después, el 23 de mayo, el agente Vélez Torres recibió los informes de balística en los que se establece que el calibre del arma que mató a Pérez Ortiz era 45.
En el juicio también declaró Lissette Sosa Vargas. Era la novia del occiso al momento de los hechos. El 20 de septiembre de 1992 su novio la fue a buscar a Aguadilla en compañía de un tal Omar *705 y su novia. Luego, camino a San Juan, se les unió una guagua Bronco con cristales ahumados; razón por la cual nunca vió a sus ocupantes. También se les unió un Volkswagen, cuyos ocupantes no conocía. Por estar enfadada con su novio, no le preguntó quiénes eran esas personas ni porqué venían en caravana hacia San Juan. Al llegar a San Juan su novio la dejó en la casa de los padres de él y le dijo que iba a ver una persona al hospital. Su novio se fue con Omar y su novia en el CRX rojo de Omar. No volvió a verlo con vida.
El testimonio medular de la fiscalía fue el de Joaquín Lassalle Velázquez. Declaró que para la fecha de los hechos tenía 23 años y se dedicaba a cuidar gallos de pelea.
Que para el día 20 de septiembre de 1992 lo fueron a buscar a su casa varias personas, para que fuera a San Juan a resolver un problema con una persona que alegadamente "le había dado unos tiros al hermano de Cachito". Querían que él fuera a hablar con "Machito", para que no hubiera más problemas.
El testigo fue a un monte y de allí desenterró su arma la cual describió como una 9mm niquelada. La llevaba "por si pasaba algo inesperado." 
Se pusieron de acuerdo para encontrarse en. la casa de la tía de Cachito, (el testigo sólo conocía a Cachito, a la tía de éste y a Rey, esposo de la tía), pues Víctor tenía que recoger a su novia. Allí se encontraron todos y de ahí salieron juntos todos los carros: la Bronco, el Oldsmobile y el Volkswagen. Iban para San Juan. Víctor, Omar y las novias de ambos en el Oldsmobile; la tía de Cachito y su esposo Rey en la Bronco y Lasalle y Cachito en el Volkswagen.
Llegaron al Centro Médico los tres carros. Entraron Rey, Cachito y la tía de Cachito a ver el hermano de Cachito. La novia de Víctor llegó hasta el Centro Médico pero no sabe el testigo en qué vehículo se fue. Dejaron el Volkswagen en el Centro Médico y se fueron en la Bronco al residencial al que llegó Ornar en un CRX rojo. Víctor, Omar y Cachito hablaron allí. Posteriormente fueron a llevar a la novia de Ornar a su casa. De ahí salieron para Gurabo a buscar a "Machito ". En la Bronco iba el testigo junto a Rey y Víctor. Ornar y Cachito iban en el CRX de Omar. No lo encontraron y volvieron al residencial, fueron a otro pueblo a buscarlo pero no lo encontraron.
Volvieron a Centro Médico y allí el testigo recogió su Volkswagen. Acordaron con Cachito de encontrarse en el residencial.
Se fueron él y Víctor en el Volkswagen y Rey y su esposa en la Bronco y Ornar y Cachito en el CRX.
Admitió que no tenía licencia para poseer y portar armas y que el arma la había comprado en la calle. Señaló que el Volkswagen se lo había comprado a un tal Albert en una feria.
Al llegar al residencial estacionaron el Volkswagen de frente en el parking porque no tenía reversa y que entre él y Víctor lo empujaron.
El Honda de Ornar estaba estacionado como a dos espacios más allá en el estacionamiento. El testigo dice que no sabe dónde estaban Ornar ni Cachito que habían llegado en el CRX.
Estando allí se les acercó un individuo con jacket, mahón y gorra y les ordenó tirarse al piso identificándose como policía. A requerimiento del fiscal identifica al apelante como la misma persona y lo identifica como "Machito". Declaró que él le preguntó a Víctor que si lo conocía y que Víctor parecía sorprendido. "Machito" les ordenó que tiraran sus armas y caminó hacia ellos ordenándoles que se tiraran al piso, lo cual el testigo hizo. Según su declaración, Víctor tiró su arma dentro del carro. Pudo observar que "Machito" tenía una pistola calibre 45 en la mano. Víctor estaba como a 6 pies del testigo. "Machito" subió su arma y le dijo al Víctor que lo estaba buscando, Víctor le dijo "No Machito" y "Machito" le disparó 6 ó 7 veces.
"Machito" llegó acompañado de otras personas que tenían armas largas. Machito le disparó a Víctor a una distancia de aproximadamente 9 pies y con la mano izquierda.
*706 La Bronco no entró al parking del residencial, salió de allí cuando comenzaron los disparos.
El testigo salió corriendo por la parte del frente del vehículo y corrió por la parte de atrás del caserío. Sintió dos impactos de bala, uno en la espalda y otro en la pierna. Mostró al jurado las heridas, ninguna de las cuales fue de gravedad.
El testigo salió corriendo y se escondió en un matorral donde pasó la noche. Caminó a la autopista hacia Río Piedras. Allí un guardia lo vio y lo llevó a Centro Médico. Le dijo al guardia que se había herido en una jaula de caballos. Del Centro Médico llamó a una amiga que lo recogió y lo llevó a su casa en Aguadilla.
El agente Vélez lo fue a entrevistar a Aguadilla y lo citó para entrevistarlo. Al principio no quería declarar, pero como vió que no tenía más opción, le dijo lo que había pasado. El agente Vélez le enseñó una cartulina con unas fotografías y el identificó al apelante.
El testigo identificó el arma 9mm que le mostró el fiscal como su arma. También identificó el arma que tenía Víctor.
A preguntas de la defensa declaró que tenía una probatoria de 12 años y que sabía que en estos hechos él estaba violando la Ley de Armas.
Cuando la defensa le hace la pregunta de si el delito por el cual está en probatoria es grave o menos grave contestó que no recordaba. También dijo no recordar la fecha de su convicción. A la defensa no se le permitió preguntar al testigo si en el delito por el cual está en probatoria había envuelta una muerte ni si habían envueltas armas. Esta preguntas fueron objetadas por el fiscal y sostenidas por el Tribunal.
No recuerda porque no fue sino tres meses después que le tomaron la declaración jurada y señala que el agente Vélez estaba presente durante su declaración jurada.
Declaró que la ropa que tenía puesta el día de los hechos la botó y no se acuerda dónde. Que no iba a cobrar nada por buscar a "Machito".
Declaró que leyó su declaración jurada antes de firmarla y al ser confrontado por la defensa con su declaración jurada en la que él declara que tenía una pistola calibre 45 niquelada, el testigo dice que fue un error. 
Indicó que luego de los hechos no ha vuelto a ver a Cachito y que nunca habló con Rey ni con la tía de Cachito sobre estos hechos. (Los cuales viven en Aguadilla, cerca de su casa).
Según el testigo, el agente Vélez no indagó sobre el guardia que lo había llevado al Centro Médico ni sobre la amiga que lo llevó de San Juan a Aguadilla.
La declaración jurada del testigo le fue leída en su totalidad al jurado.
La doctora Ofelia Vera fue la patóloga que realizó la autopsia al cadáver. El occiso presentaba tres heridas de bala en el cráneo, hacia la parte posterior izquierda; dos heridas de bala en la espalda, una herida en la palma de la mano y una herida de bala en el antebrazo izquierdo.
La perito determinó que la causa de la muerte fue debido a un severo trauma cráneo-cerebral y laceración de órganos internos por heridas de balas. Las heridas de bala mostraban características compatibles con tiros de distancia de más de dos pies. No pudo determinar la hora del fallecimiento por razón de que cuando ella recibió el cadáver estaba completamente rígido. La doctora Vera recuperó 3 proyectiles del cuerpo del occiso los cuales posteriormente fueror analizados por el Departamento de Balística de la Policía.
Finalmente, el último testigo lo fue Héctor Caraballo Olivero, especialista en identificación de *707 armas de fuego. Realizó las pruebas pertinentes en las armas que le fueron entregadas por el agente Vélez Torres. Preparó un informe.
En él consignó que algunos de los proyectiles recuperados en la escena habían sido disparados por un arma recuperada en otra escena dos o tres días después de los hechos del presente caso. Declaró además, que las armas recuperadas (en el Volkswagen; una perteneciente al occiso y otra al testigo Lassalle) nunca fueron disparadas. Los proyectiles que se recuperaron en la autopsia corresponden a un arma calibre 45. Se analizaron también unos casquillos 9mm. Estos fueron disparados por un arma de igual calibre pero no por la pistola 9mm que fue recuperada (la del testigo Lassalle).
Concluida la prueba, el Tribunal impartió las instrucciones al jurado. La defensa solicitó que se instruyera al jurado a los fines de que el testimonio de Lassalle debía ser examinado con desconfianza y sospecha porque éste era un testigo con inmunidad. El Tribunal denegó la solicitud.
Surge de los autos ante nuestra consideración que en varias instancias la representación legal del apelante solicitó la disolución del jurado. Adujo en apoyo de su contención que en tres momentos críticos del proceso apareció reseñado en el periódico El Vocero noticias altamente inflamatorias cuyo propósito eran proyectar al apelante como una persona peligrosa, que trafica con drogas y con vínculos con la mafia.
A la luz de la prueba presentada y de los errores señalados, procede esbozar el estado de Derecho.
II
Nuestro ordenamiento jurídico constitucional consagra como un derecho fundamental que le asiste a los acusados, la presunción de inocencia. Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 11. En todo proceso judicial criminal la culpabilidad de un imputado debe ser probada más allá de duda razonable. Pueblo v. Ramos y Alvarez, 122 D.P.R. 287, 315-36 (1988). Para ello, el Ministerio Público tiene que presentar prueba suficiente tendente a demostrar que todos los elementos del delito se encuentran probados. Pueblo v. Cabán Torres, 117 D.P.R. 645, 652 (1986). Ello quiere decir, que la prueba sobre los elementos del delito y la conexión con el acusado no sólo debe ser satisfactoria sino que debe producir una certeza y convicción moral en una conciencia exenta de preocupación o ánimo no prevenido. Pueblo v. Colón Burgos, op. de 12 de abril de 1996, 96 J.T.S. 52, pág. 971.

"La suficiencia de la prueba es, pues, un análisis estrictamente en derecho que aunque recae sobre la evidencia, sólo busca asegurar que, de cualquier manera en que se interprete la veracidad, los requisitos legales estarán presentes para poder permitir cualquiera de los veredictos posibles. Ante prueba insuficiente, un jurado no podría hallar culpable al acusado irrespectivamente de si la prueba amerita o no su credibilidad... Como primer paso a una determinación de suficiencia, el tribunal ha de cerciorarse que el Ministerio Público haya aducido prueba, directa o circunstancial, de todos los elementos del delito imputado... También se exige que la evidencia conecte al acusado con los delitos imputados, una función eminentemente propia del juzgador de la credibilidad. Dentro de la responsabilidad del Tribunal de examinar la suficiencia, éste ha de asegurarse de que la prueba de cargo sea una que, de ser creída, pueda conectar al acusado con el delito imputado. Ibid.

El apelante alega que la investigación realizada estuvo plagada de errores que no pueden subsanarse con el testimonio de un testigo con inmunidad. Este alegó que la prueba de cargo era insuficiente para lograr una convicción así como también era indigna de crédito, razón por la cual falló el Ministerio Público en probar su culpabilidad más allá de duda razonable.

En el caso de autos, el fiscal tenía que probar, más allá de duda razonable, que el apelante le causó la muerte a Víctor M. Pérez Ortiz mediando malicia premeditada y deliberada.

El concepto de malicia premeditada implica la ausencia de justa causa o excusa al ocasionar la muerte e implica además la existencia de la intención de ocasionar la muerte a un semejante. Esa intención se puede manifestar a través de uno de los dos de los siguientes elementos, cualquiera de los cuales es suficiente para determinar la existencia de malicia premeditada, a saber, (a) la intención específica de matar, considerada como equivalente al deseo y propósito directo, explícito, y *708 definido de matar (cita omitida), o, (b) la intención de realizar un acto o de producir un grave daño corporal cuya consecuencia probable sea la muerte de una persona (cita omitida). Este criterio se refiere a la peligrosidad envuelta en la actuación de un acusado, en el sentido de creación de un riesgo sustancial de muerte. Pueblo v. Méndez, 74 D.P.R. 915, 921-922 (1953); Pueblo v. Martínez Padró, 91 D.P.R. 536 (1964); Pueblo v. Reyes Lara, 100 D.P.R. 676(1972)."
La deliberación, por su parte, es "la resolución de matar, después de darle alguna consideración; pero cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación. Ese lapso... puede ser tan rápido como el pensamiento". Pueblo v. Rosario, 67 D.P.R. 371, 375 (1947); Pueblo v. Merced Jiménez, 100 D.P.R. 270 (1971); Pueblo v. Ramos Padilla, 88 D.P.R. 384 (1963) Pueblo v. Torres Montañez, 106 D.P.R. 125 (1977).
La malicia premeditada, al igual que la deliberación deben ser determinadas tomando en consideración los hechos, los actos y las circunstancias que rodean la muerte, la capacidad mental, la motivación, las manifestaciones y la conducta del acusado. De lo anterior puede deducirse racionalmente, pero no presumirse, la malicia premeditada y la deliberación. Artículo 14 del Código Penal (33 L.P.R.A. see. 3061); Pueblo v. Rivera Alicea, 125 D.P.R. 37, 45 (1989); Pueblo v. Gómez Nazario, 121 D.P.R. 66 (1988); Pueblo v. Torres Montañez, supra. La presencia o ausencia de estos elementos del delito de asesinato en primer grado es una cuestión de hecho a ser resuelta por el jurado. Pueblo v. Merced Jiménez, 100 D.P.R. 270 (1971).
Un análisis de la prueba presentada por el fiscal nos arroja que ésta resultó ser suficiente. La misma incluyó el testimonio de Joaquín Lassalle, testigo ocular de los hechos y cuyo testimonio pudo ser corroborado por otros testimonios y por prueba pericial. Este declaró que el apelante les ordenó (a él y al occiso) lanzarse al suelo y que tiraran las armas. Observó y describió el arma que portaba el apelante y que fue utilizada para darle muerte al occiso. Describió la posición en que se encontraba el apelante, el occiso y él. Le relató al jurado cuantas detonaciones escuchó, y vió cuándo éstas impactaron al occiso. Esta prueba quedó corroborada por el testimonio de la patóloga Ofelia Vera, quien atestó sobre los impactos de bala, la trayectoria de éstas y la posición en que se encontraba tanto el agresor como el occiso.
Así también, los testimonios de los agentes Rodríguez Tosado, Vélez Torres y del especialista en identificación de armas de fuego, Héctor Caraballo Olivero, corroboran el testimonio de Lassalle. Estos declararon sobre sus respectivas observaciones en la escena de los hechos, proyectiles y casquillos recuperados allí y los análisis practicados. El agente Rodríguez Tosado declaró que en el lugar se ocupó evidencia perteneciente a Lassalle (la pistola 9mm. y el Volkswagen). Se ocuparon además casquillos y proyectiles del mismo calibre de la pistola utilizada por el apelante. Por su parte, el agente Vélez Torres, además de los extremos cubiertos por el testimonio de Rodríguez Tosado, aportó prueba que corroboraba el testimonio de Lassalle. Este declaró sobre el área donde el testigo, luego de correr y resultar herido, estuvo escondido toda la noche. Observó la condición del matorral y las alegadas manchas de sangre. También, a cuatro días de haber ocurrido los hechos, observó que el testigo estaba herido en la espalda y en el muslo; heridas que éste alegó haber recibo en el incidente que culminó en la muerte de Víctor M. Pérez Ortiz.
En el presente caso, no sólo declaró un testigo ocular que aportó prueba sobre todos los elementos de los delitos imputados sino que, sin ser necesario, su testimonio fue corroborado por prueba independiente.
De la forma y manera en que el testigo narró que ocurrieron los hechos se puede deducir racionalmente la malicia premeditada y deliberada con que actuó el apelante al matar a la víctima.
No estamos frente a un problema de suficiencia de prueba. Tampoco frente a errores en la apreciación de la misma.
El apelante se queja de que durante el juicio los testigos de cargo se contradijeron en aspectos de sus respectivos testimonios; cuestiona el procedimiento de su identificación; así también alegó que la investigación fue deficiente y que erró el jurado en la apreciación de la prueba.
*709 Pese a que la investigación realizada por los agentes Rodríguez Tosado y Vélez Torres no constituye un modelo a seguir, la prueba presentada y creída por el jurado resultó suficiente para condenar al apelante. El hecho de que se hubieran dañado las fotos que documentaban la investigación, que no se hubiese entrevistado a otras personas involucradas en los hechos, no se realizaran pruebas cientiíicas como pruebas de absorción atómica y no se levantaran huellas dactilares, en nada perjudicó el caso del Ministerio Fiscal.
Igualmente, hubo incongruencias en la prueba; la relacionada con la descripción de la pistola 9mm ocupada en la escena. Debemos inferir que las mismas fueron explicadas a satisfacción del jurado. Los agentes alegaron que las incongruencias se debieron a errores oficinescos. Estos aseguran que las armas que identificaron en corte abierta fueron las mismas ocupadas en la escena de los hechos y las mismas que fueron entregadas por el agente Rodríguez Tosado al agente Vélez Torres. Respaldaron su testimonio con un recibo que acreditaba, que a pocas horas de éstas haberse ocupado, se describían sus características físicas, así como el número de serie.
También surgieron contradicciones en el testimonio de Lassalle y de la novia del occiso en lo relativo a la secuencia de eventos que acontecieron una vez salieron de Aguadilla y llegaron a San Juan. No obstante, estas contradicciones fueron de poca importancia.
La defensa intentó impugnar al testigo Lassalle con su declaración jurada. En ella consignó que tenía una pistola calibre 45 cuando en su testimonio en corte abierta alegó que era una 9mm.
Aunque el testimonio de Lassalle tiene varias lagunas, contradicciones y omisiones, lo cierto es que el mismo fue creído por el jurado.
El que un testigo al declarar haya recaído en inconsistencias o contradicciones no autoriza a rechazar su declaración en forma absoluta. Pueblo v. Chévere Heredia, op. 22 de agosto de 1995, 95 J.T.S. 115, pág. 48; Pueblo v. Pagán Santiago, op. de 20 de mayo de 1992, 92 J.T.S. 56, pág. 9481. Para ello, las contradicciones deben ser decisivas y tan medulares que de no ser creída su declaración, el resto del testimonio no sería "suficiente para establecer la transacción delictiva, superar la presunción de inocencia y establecer la culpabilidad más allá de duda razonable." Pueblo v. Martínez Meléndez, 123 D.P.R. 620, 624 (1989) citando a Pueblo v. Ramos y Alvarez, 122 D.P.R. 287, 317 (1988).
De otro lado, la inmunidad otorgada a un testigo no lo inhabilita para servir como tal. No obstante, el acusado puede valerse de este hecho como un fundamento para impugnar su credibilidad. Pueblo v. Ramos y Alvarez, supra, pág. 316.
En ausencia de error manifiesto, pasión, prejuicio o parcialidad, los tribunales apelativos no deben intervenir con la apreciación de los hechos y adjudicación de credibilidad que hagan los jueces de instancia o los jurados, puesto que éstos están en mejores condiciones para aquilatar la prueba oral. Pueblo v. Dávila Delgado, op. de 20 de mayo de 1997, 97 J.T.S. 68, pág. 1008; Pueblo v. Cruz Granados, 116 D.P.R. 3, 10 (1984).
El proceso investigativo tendente a esclarecer e identificar exitosamente al autor de un crimen no es tarea fácil. Intervienen numerosos factores entre los cuales se destaca la disponibilidad de testigos oculares. Sobre éstos, el criterio cualitativo testimonial, a saber, la habilidad del deponente para percibir el acontecimiento, aptitud para conservarlo en su memoria, capacidad para evocarlo,, modo de querer expresarlo, y cómo puede hacerlo, es esencial. El elemento tiempo resulta importante y, de ordinario, afecta estos factores. "Ingredientes adicionales tales como el grado de inteligencia del testigo, su facilidad o dificultad para verbalizar y explicar, el nerviosismo natural que genera la sala de un tribunal, las expectativas de una confrontación de lo atestado con el contrainterrogatorio, el interés en el desenlace final del caso y un sinnúmero de imponderables, imponen sobre los tribunales de instancia la más delicada función del quehacer judicial humano: el descubrir la verdad haciendo el mayor esfuerzo en dirimir prueba conflictiva y en muchas ocasiones incompleta." García v. A.F.F., 103 D.P.R. 356, 357-358. Este proceso mental y realidad forense, que corresponde más bien a la disciplina de la psicología del testimonio, nunca puede ser ignorado por un tribunal. Su comprensión y aplicabilidad será en última instancia el elemento que inclinará de uno u otro lado a la balanza de la *710 justicia. Pueblo v. Cruz Granados, supra, págs. 4-5, citando a Pueblo v. Morales Rivera, 112 D.P.R. 463, 464 (1982).
Recalcamos, que el testimonio de un testigo presencial, por sí sólo, de ser creído, es suficiente para sostener un fallo condenatorio, a pesar de existir algunas contradicciones o lagunas. Veáse, Pueblo v. Chévere Heredia, supra, pág. 35. En el caso de marras, el jurado luego de aquilatar el testimonio de Lassalle junto al resto de la prueba, adjudicó credibilidad. La apreciación de la prueba que haga el juzgador de los hechos merece nuestra deferencia, razón por la cual no se nos ha justificado intervenir con ella. Pueblo v. Pagán Santiago, supra. Véase también, Pueblo v. De León Martínez, op. de 16 de febrero de 1993, 93 J.T.S. 22, pág. 10406.
Por otro lado, el apelante cuestiona el procedimiento de su identificación. Basa su impugnación en que no se efectuó una rueda de sospechosos. Su contención es inmeritoria. La validez de la identificación depende de la totalidad de las circunstancias que rodearon el proceso de identificación. El análisis de confiabilidad de la identificación se centra en los criterios establecidos en Pueblo v. Peterson Pietersz, 107 D.P.R. 172 (1978). Estos son los siguientes: (1) amplia oportunidad de observar; (2) grado de atención; (3) fidelidad de la descripción; (4) nivel de certeza en la descripción del sospechoso y (5) el tiempo transcurrido entre el crimen y la confrontación.
El Tribunal Supremo en innumerables ocasiones ha resuelto que lo importante no es el método utilizado en la identificación, sino que la misma sea libre, espontánea y confiable. Pueblo v. Ramos, 122 D.P.R. 287 (1988). Más aún, el hecho de que no se celebre una rueda de detenidos, cuando ella procediere, no conlleva el efecto automático de tomar esa evidencia en inadmisible.
"La admisión de testimonio relativo a un procedimiento sugestivo e innecesario de identificación no viola el debido proceso siempre y cuando la identificación tenga suficientes elementos de confiabilidad". Pueblo v. Peterson Pietersz, supra, a la pág. 183.
Nada hay ante nuestra consideración que apunte a que la identificación del apelante fuese sugestiva o no fuese confiable. Inclusive, además de identificarlo en una confrontación fotográfica (apenas una semana después de los hechos), el testigo ocular lo identificó en corte abierta.
Cónsono con lo precedentemente expuesto, el récord demuestra que la prueba inculpatoria fue suficiente para probar los delitos imputados de conformidad a la ley y al derecho.
Además del señalamiento de error referente a la suficiencia de la prueba, el apelante señaló en su recurso que el tribunal a quo erró al no permitirle contrainterrogar a Lassalle sobre materia que fue objeto del interrogatorio directo. El error alegado se cometió.
De ordinario y sujeto a lo establecido en el inciso (A) de la Regla 46 de Evidencia, 32 L.P.R.A. Ap. IV, las convicciones sobre delitos anteriores sólo pueden ser aceptadas con el propósito de impugnar la credibilidad del testigo y únicamente cuando el delito envuelve deshonestidad o falso testimonio. En el presente caso el testigo fue convicto por el delito de homicidio, razón por la cual dicha prueba era inadmisible.
Sin embargo, la Regla 43 (F) del mismo cuerpo de Ley establece una excepción a esta norma cuando dispone que la parte contraria podrá repreguntar sobre cualquier tema cubierto en el directo. Surge de la transcripción de la prueba que el Ministerio Público le preguntó a Joaquín Lassalle si se encontraba en probatoria y si estaba declarando bajo inmunidad del Estado. Lassalle respondió en la afirmativa y manifestó que disfrutaba de una probatoria de 12 años. En el contrainterrogatorio la defensa intentó abundar sobre la clasificación de los delitos por los cuales estaba en probatoria, si las convicciones se relacionaban con alguna muerte y con la portación y uso ilegal de armas de fuego; esa línea de preguntas no les fue permitida.
El Tribunal debió haber permitido la línea de contrainterrogatorio de la representación legal del apelante debido a que los fiscales con sus preguntas "abrieron las puertas". Reconocemos que en muchas ocasiones resulta difícil trazar ésta; el asunto es uno inminentemente discrecional. No obstante, esta no es la situación en el presente caso. Pueblo v. Dones Arroyo, 106 D.P.R. 303 (1977).
*711 Una vez demostrado que se cometió el error señalado, procede resolver si el error fue uno de carácter perjudicial, pues, no todo error acarrea la revocación de un fallo o veredicto. Pueblo v. Calderón Alvarez, opinión de 18 de abril de 1996, _ D.P.R. _ (1996), 96 J.T.S. 57.
En el presente caso, si bien es cierto que el tribunal no le permitió a la defensa hacerle preguntas al testigo sobre sus convicciones anteriores, el efecto que esta omisión pudo tener en el resultado del caso no constituyó un error perjudicial que amerite la revocación de la sentencia. Pueblo v. Chévere Heredia, supra. El error cometido no fue un factor decisivo o sustancial en el veredicto. Pueblo v. Martínez Solís, _ D.P.R. _ (1991), 91 J.T.S. 29.
Además de los señalamientos de errores previamente discutidos, el apelante en su recurso le imputó al Tribunal de Primera Instancia el haber errado al no impartir al jurado las instrucciones solicitadas en cuanto a la sospecha y desconfianza con la que hay que aquilatar el testimonio de un testigo con inmunidad. El error señalado no se cometió.
La Regla 156 de las de Procedimiento Criminal, 33 L.P.R.A. R. 156, establece que "el testimonio de un co-autor será examinado con desconfianza y cautela. Siendo ello así, en casos ventilados ante jurado el juez mandatoriamente tiene que instruirlos a esos efectos. Nótese, que esta regla es de aplicación únicamente a casos donde el declarante es un co-autor. El Código Penal en su artículo 35, 33 L.P.R.A. sec. 3172, considera autores a las siguientes personas:

"a) Los que toman parte directa en la comisión del delito. '

b) Los que fuerzan, provocan, instigan, inducen o ayudan a otra persona a cometer el delito.

c) Los que se valen de una persona inimputable para cometer el delito.

d) Los que con posterioridad a la comisión del delito ayudaren a los que tomaran parte directa en la comisión del delito en cumplimiento de una promesa anterior a dicha ejecución.

e) Los que cooperan de cualquier otro modo en la comisión del delito."

Bajo el ordenamiento jurídico anterior, al coautor se le llamaba cómplice. En Pueblo v. Montalvo Acevedo, 83 D.P.R. 727, 279-730 (1961), se indicó que "cómplice es aquél que con pleno conocimiento y voluntariamente, sin que medie coacción, de su libre albedrío e intencionalmente, participa en alguna forma en la comisión de un delito, pudiendo, por tanto, procesársele por el mismo". Véase además, Pueblo v. Agosto Castro, 102 D.P.R. 441(1974); Pueblo v. Stevenson Colón, 118 D.P.R. 634(1982).
De la prueba desfilada surge que aunque Lassalle es un testigo que declaró bajo el manto protector de la inmunidad concedídale, él no es considerado como un autor o coautor de los hechos que culminaron en la muerte de Víctor Manuel Pérez Ortiz. Este no cometió, indujo, instigó, ayudó o conspiró con el apelante para cometer los delitos imputados. Por tanto, no había que brindarle al jurado la instrucción referente a que el testimonio de Lassalle había que examinarlo con desconfianza y sospecha. No obstante y como cuestión práctica, el jurado recibió prueba, que en el mejor escenario, movería a una persona prudente y razonable a examinar su testimonio con cierta sospecha y cautela. Tanto el fiscal como la representación legal del apelante llevaron al ánimo del jurado que el testigo había cometido unos delitos por los cuales disfrutaba una probatoria de 12 años; que éste tenía conocimiento que al portar un arma ilegalmente estaba cometiendo otro delito por el cual lo podían acusar y revocarle la probatoria. El jurado advino en conocimiento que mediante la concesión de la inmunidad a Lassalle no se le iba acusar por ningún delito ni se le revocaría la probatoria.
Si bien no se le brindó al jurado la instrucción de la Regla 156 de Procedimiento Criminal, por no configurar el caso de autos la situación de un coautor, sin embargo, el jurado tuvo al momento de deliberar todos los elementos necesarios para aquilatar la prueba y adjudicar credibilidad, incluyendo información que implícitamente conllevaba que el testimonio de Lassalle se examinara con desconfianza. Aunque no se cometió el error señalado, no está demás recordar que:
*712 "un error en materia de instrucciones al jurado, ya sea de instrucción errónea o de negación de instrucción correcta, no acarrea revocación automática de una convicción, sino que queda sujeto al "harmless error" o error que no acarrea revocación; esto incluye el error de dimensión constitucional. Sólo acarrea revocación el error sustancial. El efecto de error en materia de instrucciones al jurado es, pues, similar al efecto de error en materia de admisión o exclusión de evidencia." E.L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Vol. II, Cap. 1E, sec. 15.7(G), págs. 340-341.
Finalmente, el apelante se queja de que el tribunal no tomó las medidas correctivas y/o preventivas para impedir que publicidad periodística, altamente prejuiciada, llegara al jurado en momentos críticos del proceso. Se refirió la defensa a tres artículos aparecidos en el periódico El Vocero: el primero el día que comenzó la selección del jurado, el segundo, el día en que comenzó el desfile de la prueba de cargo y el tercero, el día en que el jurado se disponía a deliberar. Su reclamo no es en torno a la publicidad excesiva (que no la hubo) sino a artículos periodísticos altamente inflamatorios y prejuiciados contra el apelante. Dichos artículos incluían información en contra de la presunción de inocencia del apelante, su alegado parentezco con un hampón de la localidad y sobre su peligrosidad. Se señaló en dicho rotativo que se mantendría una fuerte vigilancia en la sala donde se ventilaría el caso por temor a que se atentara contra la vida del principal testigo de cargo. Además, la prensa reseñó que el apelante tenía pendiente otro caso por la "posesión de una potente metralleta que se le ocupó en un punto de drogas".
La publicidad que sufrió el caso del apelante motivó una petición de disolución del jurado. El tribunal no accedió a lo solicitado. En varias ocasiones, el tribunal le inquirió a los jurados (individualmente) sobre el acceso que tuvieron a la información, les impartió instmcciones, en más de una ocasión, en relación a que los artículos no podían tomarse en consideración al momento de adjudicar la controversia y estos no constituían prueba en el caso. Tomando en considéración los hechos particulares del presente caso, el error señalado tampoco se cometió.
La prensa y los medios noticiosos en general tienen una función social muy importante en una sociedad que se precia de ser democrática. Si embargo, su función debe estar acompañada de ciertas responsabilidades. Los medios noticiosos deben ser conscientes que en los procesos criminales, a los acusados les acompaña una presunción de inocencia y tienen derecho a un juicio, que si bien público, también tiene que ser justo e imparcial. No obstante, nos corresponde a nosotros (los tribunales) hacer el delicado balance de interés entre derechos, que en ocasiones aparentan estar en conflictos. Por un lado la libertad de prensa y por otro los derechos de los acusados.
Los jueces tienen la responsabilidad ineludible de tomar medidas cautelares con miras a garantizar al acusado un juicio justo e imparcial. Estos deben velar para que los jurados seleccionados en los procesos sean los idóneos, cerciorarse que éstos al deliberar tomen en consideración únicamente la prueba admitida y rechazen toda otra información exógena; particularmente la publicidad adversa al acusado. Los esfuerzos y medidas tomadas en el caso de marras fueron adecuadas y suficientes. Véase, Pueblo v. Hernández Mercado, 126 D.P.R. 427 (1990); Pueblo v. Miranda, opinión de 1 de junio de 1992, _ D.P.R. _ (1992), 92 J.T.S. 59; Pueblo v. Lebrón González, 113 D.P.R. 81(1982). Como consideración final:
"Un juicio justo, naturalmente, no significa un juicio perfecto. Los procedimientos judiciales, no hay duda, son dirigidos por, y dependen de, los seres humanos. No podemos exigir, en consecuencia, que los procesos criminales que se celebran en nuestra jurisdicción se lleven a cabo libre de errores. Es deber de todos, sin embargo, aspirar y velar porque dichos procesos sean justos e imparciales. De hecho, ello constituye un mandato constitucional." Pueblo v. Santiago Lugo, _ D.P.R. _ (1993), 93 J.T.S._, opinión de 15 de noviembre de 1993.
Si bien es cierto que el apelante, Jorge Marcano Parrilla, no tuvo un juicio perfecto, no albergamos dudas que éste fue justo.
Por los fundamentos que anteceden, confirmamos las sentencias emitidas por el Tribunal de Primera Instancia, Sala Superior de Caguas.
*713 Lo acordó el Tribunal y lo certifica la Secretaria General.
Aida I. Oquendo Graulau
Secretaria General
ESCOLIOS 98 DTA 13
1. Págs. 68, 69,108,109, 138 y 139 de la transcripción de evidencia.
2. Págs. 240 a la 243 de la transcripción de evidencia.
3. El resumen del testimonio del testigo contenido en el alegato del apelante recoge con sustancial exactitud el testimonio vertido en corte abierta por el testigo; razón por la cual lo adoptamos.
4. Pág. 426 de la transcripción de evidencia.
5. Pág. 640 de la transcripción de evidencia.
6. Págs. 651 y 652 de la transcripción de evidencia.
7. Esta arma fue recuperada en la escena donde resultó muerto, junto a dos personas más, Ornar (el dueño del CRX rojo).